**E-FILED**
Thursday, 05 December, 2013  11:15:51 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **KENNETH GRAY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| **v.** | ) | **Case No. 13-CV-1040** |
| | ) | |
| **RANDY PFISTER, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## OPINION

On January 24, 2013, Petitioner Kenneth Gray filed this Petition for Writ of Habeas Corpus By a Person in State Custody Pursuant to 28 U.S.C. § 2254 (#1). Respondent, Randy Pfister, Acting Warden of Pontiac Correctional Center, filed his Answer and Affirmative Defenses (#9) on May 9, 2013. For the following reasons, Petitioner's Petition (#1) is DENIED.

### BACKGROUND

In October 2006, a jury convicted Petitioner in Illinois state court of first degree murder (720 ILCS 5/9-1(a)(1) (2004)) of his wife Kimberly Gray. In March 2007, the trial court denied Petitioner's posttrial motions and sentenced him to 56 years in prison, which included a 25-year sentence enhancement imposed under section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(iii) (2004)). Petitioner's conviction and sentence were affirmed on direct appeal and his petition for leave to appeal (PLA) to the Illinois Supreme Court was denied. Petitioner subsequently filed a postconviction petition, which the trial court denied. The denial was affirmed by the appellate court and the PLA was denied by the Illinois Supreme Court. On January

24, 2013, Petitioner filed this Petition for a Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 (#1).  Respondent has filed his Answer and Affirmative Defenses (#9) and this case is now ready for judgment.

Factual Background

The following facts are taken from the appellate court orders affirming Petitioner's conviction on direct review (*People v. Gray*, No. 4-07-0233 (Ill. App. Ct. 2008)) and affirming the denial of Petitioner's postconviction petition (*People v. Gray*, 2012 IL App (4th) 100038-U).  This court presumes the factual determinations made by the Illinois court of appeals in those decisions to be true.  28 U.S.C. § 2254(e)(1); *Whitman v. Bartow*, 434 F.3d 968, 969 (7th Cir. 2006).

Petitioner and his wife Kim were married on May 16, 1992.  Three children were born to the marriage.  On September 23, 2005, Kim moved with the three children to her parents' home. Petitioner visited the children the next day and Kim advised him that she would return to the marital home the following day to collect some of her belongings.  At around 4 p.m. on September 25, 2005, Kim drove to the marital home with the three children.  Once inside, Kim and Petitioner argued and Petitioner refused to provide Kim with a list of her day-care clients' names and phone numbers so that she could tell the parents that she would watch the children at her parents' home.  Kim told the children to wait in the van and an aunt picked the children up as they stood in the garage.  At some point while Kim was in the house, Petitioner shot and killed her.

Kim was later discovered lying face up in the laundry room of the home next to the washer and dryer.  Her body was lying partially over the threshold of the doorway that led to the home's attached garage.  Immediately after the shooting, Petitioner got in his truck and attempted to leave the residence.  However, as he was leaving, Kim's parents and younger sister arrived on the scene

2

and blocked his truck with their vehicle.  Petitioner then ran to his neighbor Sheila Fletcher's home.

Sheila Fletcher lived approximately one-half mile from Petitioner and Kim's home.  She testified that Petitioner came to her house on September 25, 2005 and told her that he and Kim had gotten into an argument.  He asked Fletcher to call 9-1-1 and gave her the gun.  He told Fletcher "Sheila, I just want you to know that Kim cheated on me."

Vermilion County Sheriff's Department investigators Todd Damilano and Kirk Miller interviewed Petitioner approximately two hours after the shooting.  Petitioner stated that he and Kim were doing things to "spice up" their marriage.  He encouraged Kim to become involved with another individual, Lee Mincey, but later became jealous and insecure.  On the day of the shooting, Kim bragged about her relationship with Mincey and threatened not allow Petitioner to see the children.  Petitioner retrieved a handgun from the gun cabinet and walked to the kitchen while holding the gun down and out of sight.  Kim cursed at Petitioner and pointed a finger in his direction.  According to the Petitioner, as Kim was holding a clothes basket, he raised the gun and fired until it was empty.  He got another clip and put the gun to his head, but the phone rang.  It was Petitioner's mother, and he told her he just did "something bad" and left the house.  Petitioner told the investigators that he had to put the clip in the gun before he walked into the kitchen and shot Kim to death.  Kim suffered seven gunshot wounds to the front side of her body and six to the back side, two graze wounds, and one gunshot wound to the right hand.  Kim weighed 110 pounds, while Petitioner weighed 250 pounds.  Petitioner did not say he felt a threat of physical harm from Kim, did not mention an incident where Kim stood over him clicking a gun, and did not claim Kim threatened him with a knife.

Petitioner testified in his own defense.  He testified that on September 15, 2005, Kim had

3

threatened him with a knife, and that a week later, on September 22, 2005, he awoke to a "clicking sound" and saw Kim standing over him with a gun. He took the gun from Kim and returned it to the gun cabinet, which he locked, retaining the keys. On September 25, 2005, Kim said "fuck you" and came at Petitioner with a butcher knife. Petitioner "just reacted" and started firing the gun. On cross-examination, Petitioner admitted that he did not mention the knife when interviewed after the shooting but only recalled the incident months later via a flashback.

Evidence at trial showed that law-enforcement officers who processed the crime scene on the day of the shooting denied finding a knife. Rod Kaag, an investigator with the sheriff's department, testified officers went through the entire laundry room where Kim's body was located. Although he did not move the washer and dryer out from the wall, he removed a stepladder that was positioned between the dryer and a wall and used it to look over and behind the appliances. He testified that no knife was found behind, around, or under the washer and dryer.

Jerry Lee Davis, also an investigator with the sheriff's department, testified he was present when the area around the washer and dryer was searched. He and Kaag looked underneath, at the side, behind, on the top, and on the floor around the washer and dryer. He never found a knife in that area.

Additionally, Kim's aunt, Brenda Pellman, testified she and another relative were the individuals who cleaned up blood in the laundry room on the day after the shooting. While cleaning, Pellman knocked over a bucket of water that spilled all over the floor. Some of the water ran under the washer and dryer. Pellman and the other relative had to move the washer and dryer around to get up all of the water. She denied finding anything under the washer and dryer.

Petitioner presented the testimony of his aunt, Terrie Vaughn, who stated that she went to the

4

marital home on either the day after the shooting or two days after the shooting to get some clothes for Petitioner.  While in the laundry room, she dropped a sock between the dryer and the wall.  When she went to retrieve the sock, she found a knife "at the side and toward the back."  She picked up both the sock and the knife and placed the knife in the kitchen on the center island.  Vaughn did not report to police that she found a knife.  Instead, on June 16, 2006, she reported her find to Petitioner's attorney after learning from relatives that it had significance to Petitioner's case.

During trial, defense counsel tried to introduce testimony regarding the state of Petitioner's mental health after the shooting to corroborate his testimony regarding flashbacks and to show Petitioner exhibited symptoms consistent with post-traumatic stress disorder (PTSD).  Specifically, he sought to present the testimony of Randall Cunningham, a crisis-intervention counselor, and Bryan Manion, an outpatient mental-health therapist.  Both Cunningham and Manion worked for Crosspoint Human Services (Crosspoint).  While incarcerated following the shooting, the sheriff's department referred Petitioner to Crosspoint for mental-health services.

The State objected to testimony from Cunningham and Manion and Petitioner submitted an offer of proof.  The offer of proof showed that both individuals had come into contact with Petitioner.  Although Manion believed Petitioner exhibited symptoms of PTSD, neither individual was qualified to render a diagnosis of that condition.  Additionally, while receiving services from Crosspoint, Petitioner was under the care of Dr. Gary Teigland, a psychiatrist.  Dr. Teigland diagnosed claimant with major depression, recurrent.  He did not diagnose Petitioner with PTSD. The trial court sustained the State's objections to testimony from both Cunningham and Manion.

During Petitioner's cross-examination, the court ordered a lunch recess and advised defense counsel that it would prohibit "contact" with the Petitioner during that period.  This was on the

penultimate day of the trial.  Defense counsel objected to the admonition at trial, but did not include the issue in a posttrial motion.

During the first day of jury deliberations on October 20, 2006, a single juror, Richard Springston, sent a note to the trial court requesting "it be demonstrated to the jury under what conditions the *** weapon would repeatedly make a 'clicking' sound without firing a bullet and exactly what the clicking noise sounds like."  The court sent a note to Springston stating that the evidence had been concluded.  Next, the jury sent a note to the court requesting the gun, and the court sent the gun back to the jury.  As deliberations continued, the jury sent a note to the court asking: "What about intense passion as a mitigating factor?  Is that in the law?"  Over Petitioner's objection, the court responded: "The jury has been instructed as to the law that applies to this case."  The jury returned a unanimous verdict on October 23, 2006.  Based on the evidence before it, the jury rejected Petitioner's claim of second-degree murder based upon an unreasonable belief in the need for self-defense and convicted Petitioner of first degree murder in relation to Kim's death.

Following the jury's discharge, Springston wrote a letter to defense counsel.  In the letter, Springston referenced a gun "demonstration" stating: "Our experiment was considered 'undetermined,' by those involved in it in the jury room because we had no clip to experiment with and no one felt he was knowledgeable enough on this firearm to be absolutely certain of a finding. It came to nothing."

In a letter to defense counsel [it is not clear from the record if this is the same letter as the one about the gun experiment] Springston stated:

"[A female juror] did a super excellent job of reading the charges to the jury

from the paper given to us and in fact read all the pages about three times aloud

6

before she finished.  I had some conversation with her ***.  I questioned the completeness of the text because I knew of [second] degree's 'intense passion' reference and her copy did not seem to include that.  I of course was not able to explain myself as to that point and certainly dare not pull out a copy of the law from my pocket until all of our deliberations were over for fear of jeopardizing the entire trial probably, so I eventually gave up on trying to make a point."

In a subsequent letter to defense counsel Springston questioned whether it was "appropriate or at least acceptable for [Springston] to look at and copy the ILCS laws on murder/homicide." Springston suggested that "looking at a law hardly qualifies as an investigation" and noted that he had "lots of experience dealing with laws and ordinances."  In conclusion, Springston stated: "Of course we were instructed to act only upon what the court had given us in those written instructions which is what I had to do and did ***."

Following his conviction, Petitioner filed a motion for a new trial, attaching Springston's correspondence.  The trial court denied the posttrial motion.  Petitioner was ultimately sentenced to 56 years in the Illinois Department of Corrections.

ANALYSIS

Petitioner filed this Petition for Writ of Habeas Corpus By a Person in State Custody Pursuant to 28 U.S.C. § 2254 (#1) on January 24, 2013.  Petitioner raises four grounds in his petition: (1) trial counsel was ineffective for failing to retain an expert psychiatric witness to evaluate Petitioner for PTSD and to testify at trial; (2) juror Richard Springston's conduct in conducting independent research into theories and the jury's conduct in experimenting with the gun deprived Petitioner of his constitutional rights to a fair and impartial jury, confront witnesses against him, and

7

to due process of law; (3) by barring him from consulting with counsel during the 75-minute lunch break on the next to last day of trial, the trial court denied Petitioner the assistance of counsel at a critical stage in the proceedings; and (4) the trial court erred in denying Petitioner's request to instruct the jury on second degree murder based on a sudden and intense passion resulting from a serious provocation.  Petitioner's arguments will be addressed in turn.

I.    *Whether Trial Counsel Was Ineffective for Failing to Retain a Psychiatric Expert*

Petitioner argues that his trial counsel was ineffective for failing to retain an expert psychiatric witness.  Petitioner argues that evidence that he suffered from PTSD was a key component of trial counsel's trial strategy.  Trial counsel, however, did not have Petitioner evaluated by a defense psychiatrist qualified to make a PTSD diagnosis, but instead tried to introduce the testimony of two mental health professionals who were unqualified to make the diagnosis.  Petitioner argues that counsel's decision was not attributable to legitimate trial strategy because basing a defense on inadmissible evidence falls outside the bounds of constitutionally sufficient representation.  Petitioner further argues he was prejudiced because his conviction for first, instead of second degree murder, hinged on his belief that he was acting in self-defense when he shot Kim, and the PTSD testimony was crucial in explaining to the jury why Petitioner did not immediately remember that Kim was armed in his initial discussion with police.  Respondent argues that Petitioner's claim is defaulted.  Even if the claim is not defaulted, however, Respondent argues that the claim fails on the merits because the state appellate court's opinion rejecting Petitioner's argument is reasonable and well-supported by the record.

The state appellate court adjudicated Petitioner's argument on the merits.  *People v. Gray*, 2012 IL App (4th) 100038-U.  "Where a state court adjudicated the petitioner's claim on the merits,

the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prohibits a federal court from granting habeas relief unless the state-court adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence' before the state court." *Newman v. Harrington*, 726 F.3d 921, 927 (7ᵗʰ Cir. 2013), quoting 28 U.S.C. § 2254(d)(1)-(2).  A federal court's review of the state court decision under AEDPA is limited to the record before the state court. *Newman*, 726 F.3d at 927.  Federal courts reviewing habeas cases, generally, are limited to deferential review of the reasonableness, rather than the absolute correctness, of a state court decision. *Newman*, 726 F.3d at 927.

"Under § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.' [citation omitted] 'A state court decision is an 'unreasonable application of ... clearly established Federal law' when the court applied Supreme Court precedent in 'an objectively unreasonable manner.'' [citation omitted]  A 'state prisoner must show that the state court's ruling on the claim ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.' [citation omitted]   Under § 2254(d)(1), 'we presume that the courts' factual determinations are correct unless [the petitioner] rebuts the presumption by clear and convincing evidence. [citation omitted] This standard is demanding, but not insurmountable. [citation omitted] As for § 2254(d)(2), federal courts conclude that a state court decision was based on an unreasonable determination of the facts 'if it

rests upon factfinding that ignores the clear and convincing weight of the evidence.'

[citation omitted]" *Newman*, 726 F.3d at 927-28 (emphasis in original).

Petitioner's ineffective assistance of counsel claim is analyzed under the familiar two-part test developed by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). The first prong of *Strickland* requires that a petitioner show trial counsel's performance was deficient in that it fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687. However, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Under the second prong, the petitioner must show that counsel's deficient performance prejudiced petitioner's defense, meaning that counsel's errors were so serious that Petitioner was deprived of a fair trial whose result was reliable. *Strickland*, 466 U.S. at 687. Under this prong, a petitioner must show that there exists a reasonable probability, *i.e.*, a probability sufficient to undermine confidence in the outcome, that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "When a habeas petitioner challenges a state court's application of *Strickland* under § 2254(d), our review is 'doubly' deferential." *Newman*, 726 F.3d at 928, citing *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011).

The state court reasonably applied the two prongs of *Strickland*. First, the appellate court determined that counsel's performance was not deficient. The court noted that, at the time of trial, Petitioner had been under the care of a psychiatrist, Dr. Teigland, who had never diagnosed him with PTSD (and who at a December 2006 posttrial hearing testified that he had never diagnosed Petitioner with PTSD nor had he ever seen any signs of PTSD in Petitioner), and that the state "would likely have rebutted the testimony of a different expert psychiatric witness with evidence that [petitioner]

10

was under the care of a psychiatrist who never made a PTSD diagnosis." *Gray*, 2012 IL App (4th) 100038-U, ¶28. In the face of these circumstances, the appellate court noted that counsel attempted to present the testimony of two mental health professionals who, although not qualified to diagnose PTSD, were familiar with Petitioner. One, Manion, had worked with a number of individuals with PTSD and believed Petitioner exhibited signs of the disorder. The court concluded that the record supported the conclusion that counsel vigorously represented Petitioner. *Gray*, 2012 IL App (4th) 100038-U, ¶29. The state court's decision is not an unreasonable application of *Strickland*'s first prong. There is no guarantee that a defense psychiatrist would have found Petitioner suffered from PTSD. Defense counsel did attempt to introduce PTSD testimony from professionals who actually treated Petitioner, but failed in his attempt. Further, counsel did so even though he knew that Dr. Teigland, Petitioner's psychiatrist, had not diagnosed Petitioner with PTSD. The obstacles counsel faced in proving PTSD were significant. In Illinois, evidence about PTSD may be provided by an expert witness. See *People v. Wasson*, 569 N.E.2d 1321, 1326 (Ill. App. Ct. 1991). Perhaps counsel should have tried to introduce the PTSD defense through an expert. However, counsel's failure to secure an expert witness, and instead attempt to introduce PTSD evidence through two non-expert medical professionals who had treated Petitioner, does not overcome the strong presumption that counsel's performance was within the wide range of reasonable professional assistance. See *Strickland*, 466 U.S. at 689. This court must be "doubly deferential" to the state appellate court decision applying *Strickland*. *Newman*, 726 F.3d at 928. Keeping in mind this standard, the court cannot say that the state appellate court's application of the first *Strickland* prong was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harington*, 131 S.Ct. at 786-87.

11

Similarly, the appellate court's application of the second prong of *Strickland*, prejudice, was reasonable. The appellate court noted that, based on the record, the physical evidence did not support Petitioner's claim that Kim attacked him with a knife. No knife was found at the scene. The State presented testimony from law enforcement and Kim's aunt that the area of the shooting was extensively searched immediately after the shooting and no knife was found. The testimony of Petitioner's aunt that she found a knife on either the day after or two days after the shooting was rebutted by the State's witnesses and the record, which showed that she did not turn the knife over to police or report finding a knife until several months after the shooting. *Gray*, 2012 IL App (4th) 100038-U, ¶30. The court also noted that the remaining evidence against Petitioner was overwhelming, including the facts that: Petitioner's statement to police shortly after the shooting contained no mention of Kim holding a knife or threatening Petitioner in any way; Kim suffered a total of 16 gunshot wounds, including five wounds to her back, completely inconsistent with a self-defense argument; and Petitioner's statement to the neighbor, Sheila Fletcher, that Kim had "cheated on" him. *Gray*, 2012 IL App (4th) 100038-U, ¶31.

The court agrees with the state appellate court that the record does not support a conclusion that Petitioner was prejudiced. The evidence against Petitioner was overwhelming. Petitioner did not recall being threatened with a knife until he suffered flashbacks months later. The evidence at trial proved that Petitioner shot Kim 16 times, with five shots in her back. The great weight of evidence would have shown that no knife was ever recovered at the scene. Thus, the appellate court was reasonable in concluding that, even if an expert had testified that Petitioner suffered from PTSD, the outcome of Petitioner's trial would not have been different. See *Strickland*, 466 U.S. at 694. The record does not support a conclusion that trial counsel was ineffective for failing to retain an

expert psychiatric witness.  The appellate court decision on this matter was sound and a reasonable application of federal law.  Petitioner's claim on this ground is denied.

II.    *Whether Juror Springston's Conduct Deprived Petitioner of His Right to a Fair and Impartial Jury*

Petitioner next argues that the conduct of juror Richard Springston prejudiced Petitioner because Springston brought "extraneous information" into the jury deliberation room.  Specifically, Petitioner argues: (1) Springston's bringing of the Illinois second-degree murder statute as it relates to sudden and intense passion resulting from provocation prejudiced him because the trial court refused to instruct the jury on such matters, and could lead Springston to suspect the trial court had rejected Petitioner's arguments on second-degree murder in general; and (2) the jury's experiment on the "clicking-noise" made by the murder weapon prejudiced Petitioner because they could not replicate the sound Petitioner claims the gun made when pointed at him by Kim, and because this experiment occurred during jury deliberations, Petitioner was not able to rebut the experiment. Respondent argues that Petitioner's claim is meritless, as he cannot show the extraneous information brought-in to the jury room by Springston was prejudicial.  Respondent further argues that the gun being allowed into the jury was room was completely in the discretion of the trial court and that, as a practical matter, the gun had been allowed into evidence and Petitioner had every opportunity during the trial to attempt to demonstrate the "clicking-noise."

The state appellate court addressed these issues on the merits in its direct review of Petitioner's conviction.  *People v. Gray*, No. 4-07-0233 (Ill. App. Ct. 2008).  Therefore, this court will only grant habeas relief if the state court decision resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the

13

Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence before the state court.  *Newman*, 726 F.3d at 927; 28 U.S.C. § 2254(d)(1)-(2).

The court will first address Petitioner's argument that Springston's bringing of extraneous legal information into the jury room prejudiced him and violated his right to an impartial jury.  "In the constitutional sense, trial by jury in a criminal case implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."  *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965); see also *Mattox v. United States*, 146 U.S. 140, 149 (1892) ("It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment.").  "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties."  *Remmer v. United States*, 347 U.S. 227, 229 (1956).  The Supreme Court in *Remmer* further stated that the presumption of prejudice is not conclusive, "but that the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."  *Remmer*, 347 U.S. at 229.

In *Hall v. Zenk*, the Seventh Circuit, reviewing a § 2254 habeas case, analyzed: (1) whether the presumption of prejudice from *Remmer* was applicable to the states; (2) whether the state court in question acted contrary to the clearly established rule, or applied it unreasonably, in placing the

burden to show prejudice from extraneous communications on the petitioner; and (3) whether this error had a substantial and injurious effect on the petitioner. *Hall v. Zenk*, 692 F.3d 793, 799 (7th Cir. 2012). The Seventh Circuit concluded that *Remmer* applied to the state courts, and also that: (1) not all suggestions of potential intrusion upon a jury deserve a presumption of prejudice, and thus the government does not always carry the burden of proving prejudice; and (2) there are at least some instances of intrusion upon a jury which call for a presumption of prejudice. *Hall*, 692 F.3d at 801. However, because the court was reviewing a § 2254 petition, the petitioner was required to establish that he was prejudiced by the state courts' constitutional error. The Seventh Circuit stated:

> "Due to concerns of federalism, finality, and comity that attend habeas proceedings, a habeas petitioner must show that a constitutional error was not harmless to succeed on his petition. [citation omitted] More specifically, he must show that the constitutional error had a 'substantial and injurious effect' on the outcome of his case. [citation omitted] This is, in effect, an 'actual prejudice' test. [citation omitted] The *Remmer* presumption is meant to protect against the potential Sixth Amendment harms of extraneous information reaching the jury, but a state court's failure to apply the presumption only results in actual prejudice if the jury's verdict was tainted by such information. [citations omitted] Thus, [the petitioner] must now prove what he allegedly failed to prove to the [state] courts: that he was likely prejudiced by the intrusion upon his jury. It is enough, however, that we have 'grave doubt as to the harmlessness of [a constitutional error]' to grant relief. [citation omitted]" *Hall*, 692 F.3d at 805.

Here, as noted by Respondent, Petitioner cannot specifically cite to a Supreme Court case

"that a criminal defendant is deprived of an impartial jury via a juror's independent legal research, as opposed to a juror's independent research into an evidentiary matter such as investigating a crime scene, talking to witnesses, or discussing the case with state officers." Petitioner must cite to specific Supreme Court precedent to obtain habeas relief. Federal circuit precedent does not constitute clearly established federal law as determined by the Supreme Court, and therefore cannot form the basis for habeas relief under AEDPA. *Parker v. Matthews*, 132 S.Ct. 2148, 2155 (2012). Indeed, here, Petitioner cites only to three cases in support of his argument: *Remmer*, *Mattox*, and *Turner*, neither of which concern a juror taking extraneous *legal* information, as opposed to factual information, into the jury room. *Remmer*, 347 U.S. at 228 (during trial unnamed person had communicated with a juror, who later became jury foreman, that the juror could profit by bringing in a verdict favorable to the petitioner); *Mattox*, 146 U.S. at 142-43 (bailiff made comments in presence of jury that defendant had killed other men and jurors read newspaper account of trial in jury room); *Turner*, 379 U.S. at 469-70 (two deputies, who turned out to be principal prosecution witnesses, were put in charge of the jury and associated with the jury throughout the trial). Therefore, Petitioner cannot meet his threshold showing that clearly established federal law, as embodied in Supreme Court precedent, was unreasonably applied by the state court.

However, assuming arguendo the state erred, Petitioner must still demonstrate prejudice in that the jury's verdict was tainted by this outside information. See *Hall*, 692 F.3d at 805. Here, the state court noted that the jury received a full and complete set of instructions on the applicable law. Further, Springston stated that, while he had a "copy of the law" on second degree murder in his pocket in the jury room, he did not produce it and share it with fellow jurors "for fear of jeopardizing the entire trial." The court also noted that Springston relied only upon the written instructions

provided to him by the trial court.  The appellate court considered that Illinois law holds that an independent investigation by a juror may constitute error so prejudicial as to require reversal. However, the court concluded that a defendant must show competent and credible evidence of improper external influence upon the jury, and that Petitioner did "not support his claim with any evidence that the jury acted improperly" and thus did not establish that the alleged "independent research" was prejudicial in nature.  *Gray*, No. 4-07-0233, at *12.

The state appellate court's determination is not unreasonable.  There is no direct evidence that any other member of the jury was exposed to Springston's legal "research" or read the second degree murder based on sudden and intense passion resulting from a serious provocation material that Springston had in his pocket.  Springston himself commented that he based his decision only on the instructions provided by the trial court and that he never showed the material to the other jurors.  Petitioner has provided no evidence that the jury verdict was tainted by Springston's outside research, and the court finds that the state appellate court decision on this matter was reasonable.

Petitioner also argues that the "experiment with the gun" conducted during by the jurors during deliberations was prejudicial "because the experiment was designed to test the credibility relative to the incident in which he testified his wife pointed a gun at him and repeatedly pulled the trigger." Further, because jurors could not replicate the sound to which he testified, Petitioner argues that the jurors "likely concluded that he was lying about that incident and others."

In both Illinois and the federal courts, which exhibits are allowed to go back with the jurors to the jury room during deliberations is a matter left to the discretion of the trial court.  *People v. McDonald*, 769 N.E.2d 1008, 1016 (Ill. App. Ct. 2002);  *United States v. Biggs*, 491 F.3d 616, 623 (7th Cir. 2007).  In *Biggs*, the Seventh Circuit "found no error in the decision to permit the jury,

following their request, to view the cocaine exhibit during deliberations." *Biggs*, 491 F.3d at 623. In *Biggs*, the packaging of the cocaine was at issue, but the court held that "[s]ince the admitted exhibit was not passed among the jurors during trial, and since they requested to see the exhibit during deliberations, and since the government referred to the exhibit in its argument, it was reasonable and no abuse of discretion for the district court to fulfill the jurors' request." *Biggs*, 491 F.3d at 623. Similarly, here, the state appellate court found no abuse of discretion in the trial court sending the gun back into the jury room, stating:

> "Here, the gun had been admitted into evidence. Defendant was given full opportunity to argue and demonstrate the 'clicking noise' with the gun during closing argument. The jury requested the gun during its deliberations. Springston noted the 'experiment was considered 'undetermined' by those involved *** [i]t came to nothing.' No abuse of discretion has been shown." *Gray*, No. 4-09-0711, at *13.

The state appellate court decision on the gun "experiment" was not unreasonable. As noted by the state court, the gun was admitted as evidence and the trial court was responding to a request for the court to send evidence back to the jury room during deliberations. Petitioner had ample opportunity during trial to demonstrate the "clicking-noise" for the jury. Further, Springston, in his correspondence with defense counsel, noted that the experiment "came to nothing" and was left "undetermined." Petitioner has not shown that the "experiment" in any way tainted the jury's verdict or prejudiced him. Because Petitioner has not shown that the state appellate court decision was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence before the state court, his claim on this ground must be denied.

III.   *Whether the Trial Court Denied Petitioner Assistance of Counsel During Trial*

18

Petitioner claims that the trial court, by barring him from consulting with trial counsel during a 75-minute lunch break on the penultimate day of trial, denied him assistance of counsel at a critical phase in the proceedings.  Respondent argues that this claim was rejected by the Illinois court on an independent and adequate state law ground, and thus should not be reviewed by this court.

"When a state court resolves a federal claim by relying on a state law ground that is both independent of the federal question and adequate to support the judgment, federal habeas review of the claim is foreclosed."  *Kaczmarek v. Rednour*, 627 F.3d 586, 591 (7th Cir. 2010), citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  "The state law ground relied on by the state court can be procedural, in which case the claims are 'commonly referred to as being procedurally defaulted.'" *Kaczmarek*, 627 F.3d at 591, quoting *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009).  When a state court declines to address the merits of a petitioner's federal claims because they were not raised in accord with the state's procedural rules, that decision rests on independent and adequate state procedural grounds.  *Kaczmarek*, 627 F.3d at 591.  For example, "[a] finding of waiver by the state postconviction court is enough to establish an independent and adequate state ground." *Sturgeon v. Chandler*, 552 F.3d 604, 611 (7th Cir. 2009).  A federal court on collateral review will not entertain a procedurally defaulted constitutional claim unless: (1) the petitioner can establish cause and prejudice for the default; or (2) the petitioner can show that the failure to consider the claim would result in a fundamental miscarriage of justice.  *Kaczmarek*, 627 F.3d at 591.

In the federal habeas context, the application of the independent and adequate state ground doctrine, which includes procedural default, is not jurisdictional, but, rather, is grounded in concerns of comity and federalism and ensures that the states' interest in correcting their own mistakes is respected in all federal habeas cases. *Kaczmarek*, 627 F.3d at 591, citing *Coleman*, 501 U.S. at 731-

19

32.  Procedural default is considered an affirmative defense that the state must raise and preserve to avoid waiver and, generally, a party must plead affirmative defenses, such as procedural default, in its answer to properly preserve them.  *Kacmzarek*, 627 F.3d at 591-92.

The court first considers the threshold question of whether the Illinois appellate court rejected Petitioner's Sixth Amendment right to counsel claim on an independent and adequate state law ground.  "A state law ground is independent when the court actually relied on the procedural bar as an independent basis for its disposition of the case."  *Kaczmarek*, 627 F.3d at 592.  Here, in resolving the right to counsel claim, the court noted that defense counsel objected, at trial, to the trial court's admonition that Petitioner could not have contact with counsel during the lunch recess, but that defense counsel did not raise the issue in a posttrial motion.  The appellate court, citing the Illinois Supreme Court case *People v. Enoch*, 522 N.E.2d 1124, 1130 (Ill. 1988), stated that "[t]o preserve an error for appellate review, defendant must object at trial and include the issue in a posttrial motion[,]" and thus "[b]y failing to include the issue in a posttrial motion, defendant has forfeited this issue for review."  *Gray*, No. 4-07-0233, at *4.  Thus, the state court resolved the Sixth Amendment claim by applying the state's forfeiture doctrine, and the test for independence is met.  See *Kaczmarek*, 627 F.3d at 592.  Although the appellate court in *Gray* went on to address and deny Petitioner's claim under the plain error doctrine, the Seventh Circuit has consistently held that "where a state court reviews a federal constitutional claim for plain error because of a state procedural bar [], that limited review does not constitute a decision on the merits."  *Kaczmarek*, 627 F.3d at 592.

The court must now consider whether the independent state ground was adequate.  "A state law ground is adequate when it is a firmly established and regularly followed state practice at the

time it is applied." *Kaczmarek*, 627 F.3d at 592.  Petitioner does not argue that the forfeiture rule regarding failure to raise an issue in a posttrial motion is not an adequate ground for the Illinois appellate court's decision to not reach the merits of his Sixth Amendment claim.  Further, the rule requiring an issue to be raised both contemporaneously and in a posttrial motion appears to have been firmly established in 2008.  See *People v. Coleman*, 882 N.E.2d 1025, 1028-29 (Ill. 2008); *People v. Lewis*, 860 N.E.2d 299, 303-04 (Ill. 2006); *People v. Basler*, 740 N.E.2d 1, 3 (Ill. 2000); *Enoch*, 522 N.E.2d at 1130.  The court finds that the forfeiture rule requiring a defendant to object to an error at trial and include the objection in a posttrial motion in order to preserve the issue for direct review is an adequate state law ground.  See, generally, *Kaczmarek*, 627 F.3d at 592.

Therefore, Petitioner's Sixth Amendment claim that he was improperly denied access to counsel is procedurally defaulted.  As noted above, a petitioner can avoid procedural default only if he can establish one of two limited exceptions: (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 749-50.  Here, however, Petitioner has made no argument that he satisfies either exception and, because the court is under no obligation to make his arguments for him, the court finds any argument regarding the narrow exceptions to procedural default to be forfeited.  See *Crockett v. Hulick*, 542 F.3d 1183, 1193 (7th Cir. 2008) (where the petitioner fails to argue either cause and prejudice or miscarriage of justice, the court cannot consider his claim on those points); *Franklin v. Gilmore*, 188 F.3d 877, 884 (7th Cir. 1999) (the petitioner failed to argue fundamental miscarriage of justice, and the court "will not make [the argument] for him"); see also *Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) ("***we will not hunt through the hundreds of documents and thousands of pages that

make up the record to make [plaintiff's] case for him."). The Illinois appellate court resolved Petitioner's federal claim on an independent and adequate state law ground. Because Petitioner's claim has been procedurally defaulted, and because he cannot show cause for the default and actual prejudice as a result of the alleged violation of federal law or a fundamental miscarriage of justice, Petitioner's claim on this ground must be denied.

IV.     *Whether the State Court Should Have Instructed the Jury on Second-Degree Murder*

Petitioner's fourth ground for habeas review is that he was denied Due Process under the Fourteenth Amendment when the trial court denied his request to instruct the jury on the mitigating factor of sudden and intense passion resulting from a serious provocation. Specifically, Petitioner argues that by denying him this instruction, concerning Kim's supposed assault on him with a knife, the trial court deprived him of an instruction essential to his defense that he was guilty only of the mitigated offense of second-degree murder.

Petitioner is seeking federal habeas review of an Illinois state court decision to omit, on state law grounds, Petitioner's requested jury instruction. "In general, the failure of a state trial court to instruct the jury on a lesser offense does not implicate a federal constitutional question and will not be considered in a federal habeas corpus proceeding." *Reeves v. Battles*, 272 F.3d 918, 920 (7th Cir. 2001). However, Sixth and Fourteenth Amendment rights may be implicated by the omission of an instruction regarding a particular offense because such omission may effectively result in a directed verdict. *Reeves*, 272 F.3d at 920. "In a habeas action, the question is not whether the failure to instruct on a lesser included offense was correct or incorrect under state law, but rather whether failure to do so constituted a defect so fundamental that it results in a complete miscarriage of justice or omission inconsistent with the standards of fair procedure." *Reeves*, 272 F.3d at 920. The

specific inquiry is whether the failure to provide the proposed instruction so infected the entire trial that the resulting conviction violated the petitioner's right to due process. *Reeves*, 272 F.3d at 920. "Because it is the omission of an instruction that is at issue in this case, [the petitioner's] burden is 'especially heavy' because '[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.'" *Reeves*, 272 F.3d at 920, quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). To succeed on a fundamental miscarriage of justice claim, Petitioner must show that, if presented with the second-degree murder based on serious provocation instruction, the jury would "probably" have acquitted him of first-degree murder. See *Lopez v. Thurmer*, 594 F.3d 584, 588 (7th Cir. 2010).

The court agrees with Respondent that Petitioner can make no such showing. The Illinois appellate court rejected Petitioner's argument on this issue. The court finds the appellate court's reasoning to be sound. Petitioner attempted to argue "mutual combat" by himself and Kim entitled him to the "serious provocation" instruction. However, as noted by the appellate court, Petitioner outweighed Kim by more than 130 pounds. Petitioner started the confrontation which led to Kim's death. There was no physical evidence of a knife at the scene of the shooting. In his initial statements to police investigators, Petitioner made no mention of Kim holding a knife or physically threatening Petitioner. Further, even if Kim had brandished a knife at Petitioner, his response was completely out of all proportion. Petitioner shot Kim fourteen times with a handgun. Kim suffered six gunshot wounds to her back side, refuting Petitioner's assertion that she was engaged in mutual combat. Petitioner, for support, cites to the U.S. Supreme Court's decision in *Mathews v. United States*, 485 U.S. 58 (1988), for the proposition that "even if a defendant denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from

which a reasonable jury could find entrapment." *Mathews*, 485 U.S. at 62. However, the Seventh

Circuit has recognized that *Mathews* is not of constitutional magnitude (See *Eaglin v. Welborn*, 57

F.3d 496, 498 (7th Cir. 1995)), and the Illinois courts have decided not to follow *Mathews* on state

law grounds. *People v. Gillespie*, 557 N.E.2d 894, 897-98 (Ill. 1990); *People v. Eaglin*, 586 N.E.2d

1280, 1283 (Ill. App. Ct. 1992) (the Illinois Supreme Court in *Gillespie* "determined that *Mathews*

was not of constitutional magnitude, and thus need not be followed by the state courts.").

Petitioner's claim on this ground is meritless and is denied.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2254 Proceedings, this court denies a

certificate of appealability in this case (COA). A district court may issue a COA "only if the

applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §

2253(c)(2). In *Barefoot v. Estelle*, 463 U.S. 880 (1983), *superseded on other grounds by* 28 U.S.C.

§ 2253(c)(2), the Supreme Court set forth the methodology to be used in evaluating a request for a

COA. A petitioner need not demonstrate that he should prevail on the merits, but rather must

demonstrate that the issues are debatable among jurists of reason, that the court could resolve the

issues in a different manner, or that the questions are adequate to deserve encouragement to proceed

further. *Barefoot*, 463 U.S. at 893, n. 4.

The court believes that Petitioner has not demonstrated that the issues raised are debatable

among jurists of reason. The court would not resolve the issues in a different manner nor does it

believe the questions are adequate to deserve encouragement to proceed further. Petitioner has not

made a substantial showing of the denial of a constitutional right.

Further, "[w]hen the district court denies a habeas petition on procedural grounds without

reaching the prisoner's underlying constitutional claim," which has happened here on ground three, a certificate of appealability should issue only when the prisoner shows both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (emphasis added); see also *Jimenez v. Quarterman*, 555 U.S. 113, 119 n.3 (2009). This court concludes that jurists of reason would not find it debatable whether Petitioner's petition states a valid claim of the denial of a constitutional right and also concludes that jurists of reason would not find it debatable whether this court correctly found that Petitioner procedurally defaulted his Sixth Amendment claim concerning assistance of counsel during the trial. A COA is DENIED.

IT IS THEREFORE ORDERED THAT:

(1) Petitioner's Petition for Writ of Habeas Corpus By a Person in State Custody Pursuant to 28 U.S.C. § 2254 (#1) is DENIED.

(2) A Certificate of Appealability is DENIED.

(3) This case is terminated.

ENTERED this 4th day of December, 2013

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
U.S. DISTRICT JUDGE